# 12-2834-CV(L), 12-2907-cv(CON)

*To be argued by:* HAROLD F. MCGUIRE, JR.

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———————————◆———————————

MARJORIE CHARRON, THEODORE CHARRON, ANDRES MARES-MURO, RAYMOND ANDREW STAHL-DAVID, KIM POWELL, on behalf of themselves and all others similarly situated.,
*Plaintiffs - Appellants,*

ENRIQUE SUAREZ, HAMIDA MOUMOUNI, DIOGENES ABREU,
*Objectors - Appellants,*

BUYERS AND RENTERS UNITED TO SAVE HARLEM, ANTHONY CASASNOVAS, KAREN FLANNAGAN, TRACEY MOORE, RUSSELL TAYLOR, DIANE TRUMMER,
*Plaintiffs,*

— v. —

All Other Similarly Situated,
*Plaintiff - Appellee,*

— v. —

JOEL WIENER, PINNACLE GROUP NY LLC,
*Defendants - Appellees,*

PINNACLE GROUP CORPORATION, PINNACLE GROUP, LLC,
*Defendants.*

———————————◆———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF OBJECTORS-APPELLANTS
## ENRIQUE SUAREZ, HAMIDA MOUMOUNI, and DIOGENES ABREU

| | |
|---|---|
| | NORTHERN MANHATTAN IMPROVEMENT CORP. |
| | LEGAL SERVICES |
| Of Counsel: | *Attorneys for Objectors-Appellants* |
|   Kenneth Rosenfeld | 76 Wadsworth Avenue |
|   James M. Baker | New York, New York 10033 |
|   Matthew J. Chachère | 212-822-8300 |

*(appearances continued on inside)*

*(appearances continued)*

Of Counsel:

   Harvey David Epstein

   David M. Colodny

URBAN JUSTICE CENTER

*Attorneys for Objectors-Appellants*

123 William St

New York, New York 10038

646-602-5600

Of Counsel:

   Harold F. McGuire, Jr.

YANKWITT & MCGUIRE

*Attorneys for Objectors-Appellants*

140 Grand Street

White Plains, NY 10601

914-686-1500

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF JURISDICTION .....................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................2

STATEMENT OF THE CASE ............................................................2

STATEMENT OF FACTS ..................................................................8

   A.   Pre-Settlement Procedural History ......................................8

   B.   Settlement Terms ................................................................11

   C.   The Process Leading to Settlement Approval .....................16

SUMMARY OF ARGUMENT ..........................................................19

STANDARD OF REVIEW ...............................................................20

ARGUMENT .....................................................................................21

   I.   THE APPROVED SETTLEMENT CONTRAVENES RULE
       23(a)(4) BECAUSE CLASS COUNSEL DID NOT ADEQUATELY
       PROTECT THE INTERESTS OF CLASS MEMBERS POSSESSING
       PRIOR OWNER AND PRE-2004 CLAIMS ...............................21

     A.   Disparate Treatment of Class Members Must Be Justified
         Based on the Differential Strength of their Claims ..................21

     B.   The Proposed Settlement Is Both Substantively and Procedurally
         at Odds with *Literary Works* ...................................................25

     C.   The District Court's Unstated but Implied Grounds for
         Distinguishing *Literary Works* Are Not Persuasive ................33

       1.   Some Class Members' Retention of Rights Under State Law
           Does Not Justify Their Exclusion from the Rent Overcharge Relief
           Afforded to Other Class Members.............................................34

       2.   Concerns that the Class Might Be Subject to De-Certification Do Not
           Justify Relaxation of the Adequacy of Representation Requirement .......39

   II.   THE SETTLEMENT SHOULD NOT HAVE BEEN APPROVED
       BECAUSE THE DISTRICT COURT DID NOT ADEQUATELY
       ANALYZE THE FACTORS IT WAS REQUIRED TO CONSIDER
       UNDER *GRINNELL*.................................................................43

CONCLUSION ..................................................................................55

# TABLE OF AUTHORITIES

## CASES

*4947 Assoc. v. DHCR*
  199 A.D.2d 179 (1st Dep't 1993) ..................................................27, 28

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*
  483 U.S. 143 (1987).......................................................................28

*Amchem Prods., Inc. v. Windsor*
  521 U.S. 591 (1997)...................................................................passim

*Bankers Trust Co. v. Rhoades*
  859 F.2d 1096 (2d Cir. 1988) .........................................................29

*Buyers and Renters United to Save Harlem et al. v. Pinnacle*
  575 F. Supp.2d 499 (S.D.N.Y. 2008) ..............................................8, 9

*Callender v. Coastal Int'l Sec., Inc.*
  2012 U.S. Dist. LEXIS 32692 (W.D. Ky. 2012) ................................32

*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*
  504 F.3d 229 (2d Cir. 2007) ......................................................32, 33

*Charron v. Pinnacle Group NY LLC*
  2012 U.S. Dist. LEXIS 79550 ....................................................passim

*Charrons v. Pinnacle Group NY LLC*
  269 F.R.D..................................................................................passim

*Corcoran v. N.Y. Power Auth.*
  202 F.3d 530 (2d Cir. 1999) ...........................................................29

*Corsello v. Verizon New York, Inc.*
  18 N.Y.3d 777 (2012)....................................................................29

*Coulston v. Singer*
  86 Misc.2d 1001 (AT 1st Dep't 1976).............................................26

*Detroit v. Grinnell Corp.*
  495 F.2d 448 (2d Cir. 1974) .....................................................passim

*Dewey v. Volkswagen Aktiengesellschaft*
  681 F.3d 170 (3rd Cir. 2012) .........................................................33

*Gaidon v. Guardian Life Ins. Co. of Am.*
  96 N.Y.2d 201 (2001)....................................................................29

*Gaines v. New York State Division of Housing and Community Renewal*
  90 N.Y.2d 545 (1997)..............................................................26, 27

*Grimm v. New York State Division of Housing and Community Renewal*
  15 N.Y.3d 358 (2010)..............................................................28, 37

*In re Joint Eastern and Southern Dist. Asbestos Litigation*
  982 F.2d 721 (2d Cir. 1992),
  *modified on reh'g*, 993 F.2d 7 (2d Cir. 1993)..................................22, 43

*Literary Works in Elec. Databases Copyright Litig. v. Thompson Corp.*
  654 F.3d 242 (2d Cir. 2011) ...........................................passim

*Malchman v. Davis*
  706 F.2d 426 (2d Cir. 1982) ..........................................53, 54

*Maywalt v. Parker & Parsley Petroleum Co.*
  67 F.3d 1072 (2d Cir. 1995) ..............................................54

*McReynolds v. Richards-Contave*
  588 F.3d 790 (2d Cir. 2009) ..............................................20

*National Super Spuds, Inc. v. New York Mercantile Exchange*
  660 F.2d 9 (2d Cir. 1981) ..............................................49, 51

*Ortiz v. Fibreboard Corp.*
  527 U.S. 815 (1999)................................................22, 23, 32, 39, 43

*Pinnacle Hamilton LLC v. Moumouni*
  NYLJ 6/14/11 (Civ. Ct. N.Y. Co., May 24, 2011) ............................28

*Plummer v. Chemical Bank*
  668 F.2d 654 (2d Cir. 1982) ..........................................52, 54

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*
  *Anderson*
  390 U.S. 414 (1968)..............................................................53, 54

*S.E. & K. Corp v. DHCR*
  239 A.D.2d 123 (1st Dep't 1997) ........................................27

*Thornton v. Baron*
  5 N.Y.3d 175 (2005)...........................................................36

*Turner v. Spear*
  134 Misc.2d 733 (Civil Ct. NY Cty. 1987) ...............................28

*Wal-Mart Stores, Inc. v. Dukes*
  __ U.S. __, 131 S. Ct. 2541 (2011).......................................passim

*Weinberger v. Kendrick*
   698 F.2d 61 (2d Cir. 1982) ....................................................................52, 53, 54

**STATUTES**

18 U.S.C. § 1962 ...............................................................................................1

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

New York City Rent Stabilization Law § 26-516(a)................................34

New York State Consumer Protection Act, N.Y. General Business Law § 349.......3

New York Civil Practice Law and Rules § 213-a ............................................28, 36

**RULES**

9 N.Y.C.R.R. § 2525.1 ....................................................................................34

9 N.Y.C.R.R. § 2526.1 ....................................................................................34

9 N.Y.C.R.R. § 2526.1(f)(2)(i) ......................................................................27

9 N.Y.C.R.R. §§ 2200 et seq.........................................................................34

F.R.C.P. 23 ........................................................................................................54

F.R.C.P. 23(a)(4) .....................................................................................passim

F.R.C.P. 23(b)(2) ..............................................................................9, 41, 42

F.R.C.P. 23(b)(3) ..............................................................................9, 41, 42

F.R.C.P. 23(c)(4) ..............................................................................................42

F.R.C.P. 23(e)(2) ......................................................................................25, 42

## PRELIMINARY STATEMENT

Objectors-Appellants Diogenes Abreu, Hamida Moumouni, and Enrique Suarez ("Objectors") are members of a certified class of many thousands of tenants in New York residential buildings who claimed that over a period of years their landlord perpetrated concerted civil RICO and consumer fraud violations upon them. They appeal from a final judgment of the United States District Court for the Southern District of New York (Hon. Colleen McMahon) approving a settlement of the class action. That settlement excluded Objectors and the vast majority of the class from the principal benefits of the settlement without any attempt at a justification for such disparate treatment.

## STATEMENT OF JURISDICTION

Jurisdiction in the District Court was based upon the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and 28 U.S.C. § 1331. The District Court issued its decision approving the class action settlement on June 6, 2012, (Special Appendix ("SPA") at 1-54) and entered final judgment on June 15, 2012. (SPA55-59). Objectors filed a timely notice of appeal on July 13, 2012. Joint Appendix ("A") at A678. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

<u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1.    Did the District Court err in finding that the members of the class were adequately represented under F.R.C.P. 23(a)(4) even though the settlement negotiated by class counsel excluded more than 77% of the class (which was not separately represented) from a claims process that would enable a favored minority of the class to recover damages for rent overcharges?

2.    Did the District Court err in finding the settlement fair, adequate, and reasonable under the standards set forth in *Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974)?

<u>STATEMENT OF THE CASE</u>

District Judge Colleen McMahon, in *Charron v. Pinnacle Group NY LLC*, 2012 U.S. Dist. LEXIS 79550, issued the decision appealed from, which was reflected in a final judgment of June 15, 2012.  This decision approved the settlement of the class action.

In October 2011, after the settlement had been preliminarily approved, Objectors – three individual class members – moved to intervene as additional plaintiffs. (A713 – 921)  Although Judge McMahon denied intervention, they filed timely objections to the proposed settlement and participated through non-profit legal services and *pro bono* counsel in subsequent briefings and hearings.  All five of the named class representatives likewise opposed the settlement. (SPA9, A935-

2

1112)  The class representatives appeal separately (A679 – 681) and the two

appeals have been consolidated.

The underlying claim was brought in 2007 against Pinnacle Group NY LLC,

a major New York City landlord ("Pinnacle") and Joel Weiner, its principal owner

(collectively "defendants"), alleging that defendants had violated RICO and the

New York State Consumer Protection Act, N.Y. General Business Law § 349

("NYCPA").  Plaintiffs' essential charge was that defendants had fraudulently

registered, demanded and collected rents from many thousands of tenants in excess

of those permitted by New York State's rent regulation laws, with the goal of

illegally increasing rents and/or evicting tenants entitled to such regulated rents.

The complaint sought substantial injunctive and declaratory relief, compensatory

damages, an audit and accounting of all rents collected, and disgorgement of

unlawful rent overcharges.

Without any merits discovery, the District Court approved a settlement with

the following essential terms: (i) an injunction that would order Pinnacle to observe

"best practices" in future dealings with tenants; (ii) an audit of a sample set of the

leases entered into during 2008-10 that would be designed to determine their

legality; and (iii) a streamlined claims process that would allow Pinnacle tenants to

prosecute rent overcharge and other claims informally before a court-appointed

Claims Administrator who would be empowered to award damages for rent

overcharges and tenant harassment.

Significantly, the settlement's terms created two large sub-groups of Pinnacle tenants (and class members) that it excluded from the rent overcharge claims process. The first sub-group ("prior owner claimants") could not utilize the claims process to recover for illegal rents charged by Pinnacle if those illegal rents had initially been set by a prior owner. The second sub-group ("pre-2004 claimants") could not make claims under the claims process for illegal rents that had initially been set by Pinnacle itself prior to July 11, 2004.

Remarkably, these disfavored sub-groups included all five of the class representatives and more than 77% of the entire certified class. No justification for these distinctions among class members was ever advanced, much less analyzed or discussed, by the proponents of the settlement or in the court's opinion.

This result cannot stand under Second Circuit law.  This Court has repeatedly held – most recently in *Literary Works in Elec. Databases Copyright Litig. v. Thompson Corp.*, 654 F.3d 242 (2d Cir. 2011) – that a class action settlement cannot provide different relief to different sub-groups of the class unless the disparity is justified based on the differential strength of the claims possessed by sub-group members.  654 F.3d at 252-53.  The record in this case is devoid of any suggestion that the disfavored class members had weaker cases than the favored minority, but – because they were not separately represented − the settlement could

4

not stand even if the discount applied to the claims of the disfavored sub-groups appeared fair on its face, not even if there were other strong indicia of fairness, such as the participation of highly respected and capable mediators in the settlement negotiations. *Id*. at 252. Where groups of class members are treated differently by a settlement, the district court *must* create formal subclasses and appoint independent counsel to represent each sub-class before approving the settlement. Otherwise, the district court cannot conclude that the settlement satisfies the adequacy of representation requirement of Rule 23(a)(4). This Court explained:

> The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?

654 F. 3d at 253.

The District Court's failure to adhere to the holding of *Literary Works* is especially striking in this case because the disfavored sub-groups comprised the vast majority of the class (including the Objectors), and because class members in these sub-groups did not simply receive a lesser measure of rent overcharge relief than favored class members: they received nothing at all. This is even more remarkable because there is little if any difference in settlement value between the claims of the favored and disfavored sub-groups, and because no effort was made to justify differential settlement terms based on the value of the claims presented. (As Objectors demonstrated in multiple submissions to the District Court, under

5

controlling law, the fact that a tenant's rent had been set before July 11, 2004, or by a prior owner – or both – makes precious little difference to the strength of her case.) Moreover, the proponents of the settlement, *i.e.* class counsel and defendants, *never even claimed* that the drastic differential in recovery between the favored and disfavored sub-groups was justified by the different strength and settlement value of their claims. Indeed, the only explanation class counsel ever offered for a settlement that denied rent overcharge relief to the disfavored sub-groups was that Pinnacle was unwilling to include them.[1]

The District Court largely ignored Objectors' contentions on this subject. The opinion never even mentions *Literary Works* nor does it discuss the principles it sets forth. The issue of disparate treatment is treated only very obliquely when Judge McMahon indicates that no harm has been done to the more than 77% of class members holding excluded claims because the settlement did not extinguish their rights to assert separate and individual rent overcharge claims under state law in state forums. (SPA37–38, 40, 49-50) This "no foul" approach suggests that a settlement can be considered fair even though it denies the material benefits of class litigation to sub-groups of class members if they are not positively harmed, or if they are merely left in the position they would have occupied if the case had never

---

[1] Certainly, class counsel *could not* evaluate the relative strength of the claims in the case because they conducted no merits discovery whatever.

been filed on their behalf. The District Court also dismissed the practical reality that the ability of disfavored class members to pursue the state court remedies they possessed when the class action was filed in 2007 has been eroded, and in some cases extinguished, by the passage of time. The court's rationale was entirely unprecedented and, indeed, as discussed below, directly contravenes controlling authority.

As a justification for approving the settlement, the District Court's opinion repeatedly evinces concern that the case may no longer be viable as a class action in the wake of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541 (2011). (SPA2–3, 5, 23, 30–32, 50) Clearly the court was troubled that disapproval of the settlement might lead to decertification, with the result that "the net gain to tenants from this class action would be zero..." *Id*. at SPA50. Plainly, in the court's mind, this prospect meant that even the members of the disfavored sub-groups would be better off if the settlement were approved than if it were not. *Id*.

Objectors, however, believe (for reasons explained below at pages 39-42) that *Wal-Mart* poses no appreciable threat to the continued maintenance of this litigation as a class action. Strikingly, the District Court's decision does not actually analyze that question; it simply raises it. However, even assuming the District Court's apprehensions about decertification were justified, it makes no

7

difference. The unexplained and unjustifiable exclusion of more than 77% of the

class members from the rent overcharge claims process is an irremediable structural

flaw regardless of the benefits flowing to others. Class counsel, despite what we

must assume to be good intentions, inadequately represented the class and its easily

definable subgroups under *Literary Works* and this Court's other decisions. Those

decisions required that the District Court designate formal subclasses with separate,

independent legal representation for class members treated differently from others.

The court should have required the disfavored subgroups to be adequately

represented, and should not have approved the settlement.

STATEMENT OF FACTS

A.    <u>Pre-Settlement Procedural History</u>

On July 11, 2007, nine individual tenants and a non-profit organization filed

this case against Pinnacle and its principal owner.[2] The complaint, as eventually

amended October 15, 2007, (A53-125) charged that the defendants were engaged in

a conspiracy to illegally and fraudulently inflate the rents of tenants living in more

than 400 Pinnacle-owned buildings in New York City, both in order to collect

---

[2]  The claims of the non-profit organization were dismissed by the District Court
for lack of standing in its decision of September 5, 2008. *Buyers and Renters
United to Save Harlem et al. v. Pinnacle,* 575 F. Supp.2d 499, 501 (S.D.N.Y.
2008) (A126, 138). Four of the original plaintiffs settled their claims with
Pinnacle individually. *Charrons v. Pinnacle Group NY LLC,* 269 F.R.D. 221, 236
(S.D.N.Y. 2010) (A207, 210).

8

larger rents and/or in order to empty rent-regulated apartments that defendants desired to convert into condominiums or co-ops.  Among the means allegedly employed were falsifying the rents that could be lawfully charged; falsifying the status and cost of repairs to justify rent increases; refusing to acknowledge tenants' succession rights; misrepresenting tenants' rent payment status; filing meritless eviction suits; and otherwise harassing tenants.  (A56-57)  Defendants' conduct was claimed to violate both RICO and the NYCPA. (A56)

Plaintiffs asked the District Court to certify a class consisting of the residents of some 21,000 Pinnacle-owned apartments under Rules 23(b)(2) and 23(b)(3), F.R.C.P.  The relief sought included preliminary and permanent injunctions restraining defendants' unlawful practices, the appointment of an independent monitor to oversee defendants' future conduct, a complete audit and accounting of rents, the disgorgement of rents illegally collected, compensatory damages, statutory, punitive and treble damages, and attorney's fees.  (A121-123)

On September 5, 2008, the District Court denied defendants' motion to dismiss the complaint, holding that plaintiffs had successfully pleaded claims under both RICO and the NYCPA.  *Buyers and Renters United to Save Harlem et al. v. Pinnacle*, 575 F. Supp.2d at 507-512 (A138-148).  The Court chose to exercise supplemental jurisdiction over the state law claims.  *Id*. at 512. (A147)

Following discovery limited to class certification issues, plaintiffs moved for

certification on June 30, 2009. (D.Ct. Docket ## 49, 50; *see* A174-206).  On April

27, 2010, the District Court certified two classes: an injunctive class, consisting of

all persons currently residing in rent-stabilized or rent-controlled apartments in

buildings owned by Pinnacle, and a liability class,

> comprised of all persons who, at any time between July 11, 2004 and
> the date of this opinion, were tenants in rent-regulated apartments in
> New York City directly or indirectly owned in whole or in part by the
> Pinnacle Enterprise.

*Charrons v. Pinnacle Group NY LLC*, 269 F.R.D. at 228–29, 240, 250. (A214–216,

241, 244)[3]

Insofar as the liability class was concerned, the court found that common

issues "predominated" over issues affecting only individual class members as to all

the issues covered by the complaint other than damages, which were excepted

because the damages suffered by individual class members could not be established

through generalized proof.  *Id.* at 239-40. (A239-241)  The court found that the

liability class could nevertheless go forward under Rules 23(b)(3) and (c)(4) on

issues other than damages.  *Id.* at 240-44. (A237-248)  If those issues were resolved

in plaintiffs' favor, the court would then proceed, at a later date, to consider

---

[3]  The court rejected as unnecessary a proposal by plaintiffs to divide the liability
class into four subclasses defined by the type of misrepresentation tenants were
subjected to.  269 F.R.D. at 239. (A241) No proposal was made (then or thereafter)
to divide the class into subclasses based on the dates of initial leases or the identity
of original landlords.

possible methods of determining damages, such as individualized proceedings before a magistrate judge or special master, decertifying the class and providing notice to class members about how to proceed to prove damages, or altering or amending the class. *Id*. at 242-43 (A245-246).

Assisted by Magistrate Judge Ronald L. Ellis (and without conducting any discovery on the merits of the liability claims), counsel for the parties engaged in settlement discussions beginning in the fall of 2010 and arrived at an agreement in August 2011. (A251-341)  Counsel jointly moved for preliminary approval of the settlement on August 11, 2011. (D.Ct. Docket # 125)  All the representative plaintiffs objected.  Judge Ellis, to whom Judge McMahon had referred the matter, preliminarily approved the settlement on August 17, 2011, (A342-370) and, on August 31, 2011, approved the form of notice to class members (A290-302), scheduling a fairness hearing for October 20, 2011. (D.Ct. Docket # 129)  By the terms of the notices sent to class members (A732, 742-747), the deadline for filing objections to the proposed settlement or opting out of the class was October 7, 2011.

B.    <u>Settlement Terms</u>

As originally proposed by the parties, the settlement agreement (A251-341, 371-373) included the following major components:

- <u>Best Practices</u>.  Pinnacle agreed to a set of protocols (A269, 303-327)

11

governing its future dealings with tenants regarding (1) setting initial rents and rent increases, (2) legal proceedings against tenants, (3) tenant requests for repairs and services, (4) a telephone hotline, and (5) training of Pinnacle staff.  A court-appointed Claims Administrator would monitor and enforce compliance through the Claims Administration Procedure, described below.  These provisions would remain in force for two years. (A282)

- Lease Audit.  A sample of rents set by Pinnacle between January 1, 2008, and April 27, 2010, would be audited by an independent certified public accountant to determine whether they complied with New York State's rent stabilization and rent control laws.  If the audit determined that more than 15% of the sample showed rent overcharges of $10 or more per month, then all new leases executed during that time period would be reviewed, and Pinnacle would be required to adjust all rents to legally permissible levels. (A278-279)

- Claims Process for Damages Claims.  Eligible class members wishing to pursue damages claims against Pinnacle for past rent overcharges as well as a variety of "harassment" claims could file their claims before a Claims Administrator appointed by the Court. (A275-277)  Such tenants could initiate the process by filing simplified notice of claim forms. The proceedings before the administrator would be informal, not governed by the rules of evidence. (A268, 271)  Eligible tenants proving rent overcharge claims − which excluded the vast

12

majority of tenants as described below − would receive their actual damages or double damages plus interest in the case of willful violations. (A277)  Tenants who proved harassment claims would receive the greater of their actual damages or penalties ranging up to $1,500, depending on the gravity of defendants' conduct. (A280)

- <u>Payments to Organizations to Facilitate the Claims Process</u>. Pinnacle would pay $2.5 million to certain specified community legal services organizations and other groups to provide legal assistance to tenants wishing to assert damage claims through the claims process or otherwise requiring assistance with the settlement. (A273)  In addition, Pinnacle would bear the expense of the claims process itself. (A282)

- <u>Attorneys' Fees</u>.  Pinnacle agreed that legal fees of $1.25 million and expenses amounting to $200,000 would be awarded to class counsel, subject to the District Court's approval. (A284)

Two additional aspects of the settlement are critical to understanding this appeal:

- <u>Excluded Sub-groups</u>.  As noted, the terms of the settlement excluded two sizeable sub-groups of class members from being eligible to participate in the claims process for rent overcharge claims (the right to file harassment claims was not affected).  The settlement agreement excluded the first sub-group, "prior owner

13

claimants," under ¶ 61(b), (A276-277) by providing that:

> Pinnacle and the defendants shall not be liable for any rent overcharge for any rent set by a prior owner of the building in question.  It shall be a defense to any allegation of overcharge before the Claims Administrator that Pinnacle or the Defendants relied on a rent set by a prior owner with [the city rent administrator], or contained in documentation from the prior owner of the building in question.

The second sub-group, "pre-2004 claimants," was excluded by 61(a) of the settlement agreement, (A276) which provided that

> Any rent set on or before July 11, 2004, shall not be subject to challenge.

The size of these excluded sub-groups was never delineated or even explored.  The sub-groups were clearly large because every one of the five class representatives remaining at the time the settlement was proposed belonged to one sub-group or the other, or both.[4]  Following a status conference conducted by the court on October 28, 2011, Judge McMahon, responding to concerns voiced by Objectors, directed Pinnacle to conduct a survey of 18 representative buildings to determine the approximate percentage of class members in the two excluded sub-groups. (A477-478, 488)  In response, Pinnacle estimated (in an unsworn

---

[4]  Plaintiffs Marjorie and Theodore Charron's original lease was with Pinnacle in June 2001 (A179, 184); Plaintiff Andres Mares-Muro's original lease in September 2003 was with a prior owner, Baruch Singer (A189);  Plaintiff Raymond Andres Stahl-David's initial lease in September 2005 was with a prior owner, Lisco Holdings LLC (A198-200); Plaintiff Kim Powell has resided in her apartment since 1978 (A174).

communication) that 77% of class members were excluded as prior owner claimants and 73% as pre-2004 claimants. (A543-545)  These estimates almost certainly understate the case.[5]  Indeed, since these two groups do not necessarily overlap, the percentage of tenants eligible to pursue rent overcharge claims theoretically could be as low as 6.25%.[6]

- Released Claims.  Under ¶ 72 of the Settlement Agreement as

originally proposed, (A283-284) class members not exercising their right to

opt out would have been required to release defendants from

> any and all claims, suits, judgments, demands, rights, liabilities,
> damages, losses, attorney's fees, interest, expenses, costs and causes of
> action, known or unknown, accrued or unaccrued, arising *[sic]* that
> are, were, or could have been asserted in the underlying Action or
> under the provisions of this Agreement ....

---

[5]  The court denied Objectors' motion to intervene and conduct discovery on this subject among others, and also their request to participate in the selection of Pinnacle buildings used in the sample or to otherwise access the data on which Pinnacle's estimates were based.(A451-453, 477, 494-511, 527-529)  Pinnacle's estimates should therefore be viewed as no more accurate than any contested "fact" alleged unilaterally by a party and not subjected to a fact-finding process.

[6]  That is, if 77% of class members are excluded as prior-owner claimants, then the *maximum* percentage of class members with eligible claims is 23%.  But some of this "eligible" 23% will be excluded as pre-2004 claimants – theoretically as much as 73% of the group – which could mean that slightly less than 6.25% of the class would be able to obtain relief for rent overcharges.  The actual number will undoubtedly be greater than 6.25% because a pre-2004 claimant will have a higher than average chance of also being a prior owner claimant.

15

By operation of this provision, class members would not only have been barred from bringing claims that had been asserted in the complaint on their behalf, *i.e.,* claims under RICO and the NYCPA, but also any other claims that "could have been asserted" on their behalf. Such potential claims necessarily included rent overcharge claims that individual tenants could have brought directly under New York State's rent control and rent stabilization laws which, like the state law claims actually brought under the NYCPA, could have been asserted at the time of the complaint. This provision barring the pursuit of rent overcharge claims before state courts or administrative agencies would have been enormously valuable to Pinnacle and, if it had been approved, would have had draconian consequences for class members belonging to the two disfavored sub-groups. Unlike the favored 23% (or less) of the class, they would not have been allowed to bring rent overcharge claims before the Claims Administrator. Like the favored 23%, however, they would have been barred from bringing such claims anywhere else. Thus, under the settlement as it was proposed and preliminarily approved, members of the disfavored groups would not only have received no affirmative rent overcharge relief; their potential rent overcharge claims against Pinnacle would have been completely extinguished.[7]

C.    The Process Leading to Settlement Approval

On October 6, 2011, Objectors moved to intervene and filed formal

---

[7] *See* Objectors' Brief dated October 6, 2011 (A812, at A822-835).

16

objections to the proposed settlement, arguing that the treatment of the two

disfavored sub-groups rendered the settlement unfair, that other aspects of the

settlement were inadequate, that the notice that had been mailed to class members

was defective, and that the settlement violated the public policy of New York State.

(A713-921) Objectors sought to become parties, *inter alia*, to conduct additional

discovery with regard to the preliminarily-approved settlement and the merits of the

case.  During an initial argument before Magistrate Ellis on October 7, 2011 (A375-

424), the motion to intervene was denied without prejudice. (A374)  However, as a

result of this filing, the District Court directed that the fairness hearing scheduled

for October 20, 2011, be adjourned and that the parties and proposed intervenors

appear for a status conference on October 28, 2011. (D.Ct. Docket # 138)

    At the October 28, 2011, conference, Objectors' motion to intervene was

again denied from the bench on the ground that Objectors could effectively be

heard in opposition to the settlement without actually being accorded the status of

parties. (A446-447)  Objectors' requests to conduct discovery were likewise denied

*in toto*. (A450-452, 477-478)  However, the Court required that the notice to class

members be revised and reissued, with the parties and Objectors to confer on the

revised form of notice. (A466-475) As noted above, the court also required

Pinnacle to conduct a sampling in order to estimate the number of class members

belonging to each of the excluded sub-groups identified by Objectors. (A477-478,

17

A488)[8] Pinnacle and Class Counsel also presented to the Court at that conference a rider to the Settlement Agreement which provided that members of the two disfavored sub-groups, while still unable to participate in the claims process for rent overcharge claims, would no longer also be barred from asserting state law rent overcharge claims in any state forums still available to them. (A457-459, 425).

In December 2011, the court approved (A490-493) a revised form of notice proposed by Class Counsel and Pinnacle (A682-709) (over objections voiced by Objectors (A547-561)), which was mailed to class members on January 6, 2012. (A492)[9]

Final memoranda concerning the Settlement Agreement were filed by counsel for Objectors (D.Ct. Docket ## 189, 197), class counsel (D.Ct. Docket ## 181, 192), and the five class representatives (by that time, as a practical matter, proceeding *pro se* in opposition to the settlement brokered by their former counsel). (A935-1109)  The fairness hearing was held on April 12, 2012. (SPA12)  No evidence was taken, by affidavit or otherwise. The court received statements in opposition to the Settlement Agreement from individual class members and from

---

[8]  By Order to Show Cause on January 3, 2012, Objectors sought to rectify Pinnacle's lack of transparency and co-operation in this endeavor (A494-511), but that motion was opposed by Pinnacle (A512-523) and Class Counsel (A524-525), and denied by the Court on January 12, 2012 (A527-529).

[9]  A supplemental notice was sent later, in March 2012, to certain class members inadvertently omitted from the January mailing. (SPA11-12)

18

the class representatives, and entertained some discussion with counsel for

Objectors, class counsel, and counsel for defendants. *Id.* The court also requested

that counsel respond to a series of written questions concerning aspects of the

proposed settlement, (A565-568) which all counseled parties did by April 20, 2012.

(A569-590, 591-618, 710-712)  The Court issued its decision approving the

settlement on June 6, 2012. (SPA1-54).

## SUMMARY OF ARGUMENT

The approved Settlement Agreement was both substantively and procedurally

flawed.  Substantively, it discriminated against prior owner claimants and pre-2004

claimants without justifying that discrimination by finding that their claims had a

lesser settlement value than those of the favored 23%. Procedurally, the District

Court erred by failing to acknowledge that the disfavored sub-groups constituted

distinct subclasses requiring independent legal representation.  Together, these

errors undermined the Court's ultimate findings that the settlement was fair and

adequate and that all class members had been adequately represented under Rule

23(a)(4).

The District Court expressed but did not analyze an overriding concern − that

failure to approve the settlement might result in decertification of the class.  Even if

well-founded (which it was not), that concern could not justify the Court's

disregard of Rule 23's requirements that the settlement be fair and that (since it

19

created disparate interests among groups of class members), those groups needed to be separately represented.

The District Court's analysis of the factors set forth in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) was also deficient. The court placed heavy reliance on the multiple factors dealing with litigation risk, such as the risks of establishing liability, establishing damages, maintaining the class through trial, etc. Yet, since those risks are present in virtually every case, their mere presence does not help to distinguish between good settlements and bad. In order to do that, the court must scrutinize the record with particularity in order to determine whether, say, the particular risk of establishing liability in this case, or any other litigation risk, is great, middling, or small. The District Court heard no evidence on this subject and undertook no such analysis; and, indeed, could not have done so easily because class counsel had conducted no merits discovery and provided no *case-specific* information about litigation risk to the Court. Without such an analysis, the court should not have determined that the Settlement Agreement was fair, adequate, and reasonable.

## STANDARD OF REVIEW

This Court reviews the District Court's decision to approve a class action settlement under the abuse of discretion standard. *McReynolds v. Richards-Contave*, 588 F.3d 790, 800 (2d Cir. 2009). Factual findings relating to settlement approval

20

are reviewed under the clearly erroneous standard. *Id*. The Court reviews *de novo* the District Court's interpretations of law. *Id*.

ARGUMENT

I.    THE APPROVED SETTLEMENT CONTRAVENES RULE 23(a)(4) BECAUSE CLASS COUNSEL DID NOT ADEQUATELY PROTECT THE INTERESTS OF CLASS MEMBERS POSSESSING PRIOR OWNER AND PRE-2004 CLAIMS

    A.    Disparate Treatment of Class Members Must Be Justified Based on the Differential Strength of their Claims

The approved settlement created three distinct sub-groups – *de facto* subclasses – of class members who had been subjected to rent overcharges. One sub-group received highly favorable treatment by being enabled to proceed with rent overcharge claims before the court-appointed Claims Administrator. The remaining two sub-groups were denied any such right to pursue relief for overcharges. This discrimination among sub-groups is remarkable in that the excluded sub-groups did not merely receive less than the favored sub-group; they received quite literally nothing at all.[10] It is also striking that the disfavored sub-groups were not just a small minority whose interests were sacrificed, they constituted the overwhelming majority of claimants, at least 77% of the class and perhaps appreciably more, and included all of the surviving class representatives.

---

[10]  This is not to say that disfavored sub-groups might not benefit from the right to bring harassment claims before the Claims Administrator or from the Court-ordered "best practices." *See supra* pp. 11-12.

21

Case law has something to say about the disparate treatment of sub-groups of class members. In *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997), the Supreme Court reviewed a class action settlement reached on behalf of hundreds of thousands of persons exposed to asbestos. Some had already manifested asbestos-related injuries; others had not yet manifested injury and perhaps never would. 521 U.S. at 607-08. The former group was interested in generous immediate payment from a limited fund; the latter in the reservation of ample funds for possible future claims. *Id.* at 626. Despite this basic conflict, the class was represented only by individuals purporting to speak for the class as a whole. Quoting this Court's decision in *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 982 F.2d 721, 742-42 (2d Cir. 1992), *modified on reh'g*, 993 F.2d 7 (2d Cir. 1993), the Supreme Court held that this was impermissible under Rule 23(a)(4):

> Where differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class. ... The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.

521 U.S. at 627.

The Supreme Court reaffirmed its decision in *Amchem* two years later in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), another asbestos case. *Ortiz*

22

involved the same conflict present in *Amchem* between already-injured and

exposure-only claimants, and this conflict dictated the same result.  527 U.S. at

856-57.  In addition, there was a conflict, reminiscent of one in this case, between

pre- and post-1959 claimants because the defendant asbestos manufacturer had

carried liability insurance until 1959, making the claims of persons injured or

exposed in 1959 or earlier much more valuable.  527 U.S. at 857.  This conflict also

required "the structural protection recognized in *Amchem*," *viz.*, the formation of

subclasses.  *Id.*

 The implications of *Ortiz* are thus both substantive and procedural for cases

involving sub-groups of class members with claims of varying strength:

Substantively, the varying benefits of the settlement to subgroups must be justified

based upon the relative strength of their claims.  Procedurally, that allocation must

be arrived at through the participation of independent counsel dedicated to putting

forward each subgroup's best case.

 These two strains of *Amchem* and *Ortiz* came together in 2011 in this Court's

seminal decision in *Literary Works in Elec. Databases Copyright Litig. v.*

*Thompson Corp.*, 654 F.3d 242.  That class action for copyright infringement was

brought by freelance authors who had sold works to print publishers − works which

the publishers had begun to publish online without compensation.  The settlement

provided its most generous compensation to authors whose works had been

23

registered for copyrights in time to qualify for statutory damages, lesser
compensation to authors who had registered with the Copyright Office at a later
date, and the least compensation to those who had never registered.  654 F.3d at
246.  The named plaintiffs had negotiated the settlement for the class as a whole
without separate representation for the three subgroups.  654 F.3d at 252-53

       Substantively, this Court held that the district court was required to satisfy
itself that the compensation awarded to the various sub-groups adequately reflected
the strength of their claims.  "It was not only appropriate but also necessary for
Category C claims to recover less than Category A and B claims." 654 F.3d at
253.[11]   Based on that principle, this Court proceeded to analyze the fairness of the
settlement and concluded that in one respect – a provision that deprived the least
favored subgroup of all compensation if total claims exceeded $18 million – it was
obviously unfair.  654 F.3d at 253-54.  This, in itself, demonstrated a lack of
adequate representation.  *Id*. at 253.

       This Court went on to hold that, even absent these indicia of unfairness, the
settlement could not be approved because the record on the fairness of the
settlement had not been formed with the participation of counsel motivated to

---

[11]  This Court also stated at 654 F.3d 252, "*Amchem* ... also allows courts, in
assessing the adequacy of representation, to examine a settlement's substance for
evidence of prejudice to the interests of a subset of plaintiffs."

24

demonstrate unfairness:

> The problem, of course, is that we have no basis for assessing whether the discount applied to Category C's recovery appropriately reflects that weakness.  We know that Category C claims are worth less than the registered claims, but not by how much.  Nor can we know this in the absence of independent representation. The Supreme Court counseled in *Ortiz* that subclasses may be necessary when categories of claims have different settlement values.  The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?

654 F.3d at 253.

In other words, this Court reasoned, the adequacy of representation requirement of Rule 23(a)(4) and the "fairness" inquiry of Rule 23(e)(2) are independent of one another.  654 F.3d at 254.  As a result, "adequacy of representation cannot be determined solely by finding that the settlement meets the aggregate interests of the class or 'fairly' compensates the different types of claims at issue." *Id.* (citation omitted).  "[W]e must ask independently whether the interests of all class members were adequately represented." *Id.*  Thus, when a settlement is proposed that would accord different benefits for different categories of claims, the affected subclasses should have separate representation both in the negotiation of the settlement and in its ultimate presentation to the district court.

B. <u>The Proposed Settlement Is Both Substantively and Procedurally at Odds with *Literary Works*</u>

The proposed settlement in this case values the rent overcharge claims possessed by prior owner and pre-2004 claimants effectively at zero.  By contrast

25

with the Category C claimants in *Literary Works*, whose claims were admittedly of little value compared to the claims possessed by authors with registered copyrights, the prior owner and pre-2004 claims here concededly have substantial settlement value. Indeed, there is every reason to believe that there is no meaningful difference in settlement value between their claims and the claims of the favored 23%.

If not prohibited by the settlement, class members whose overcharges arose because of the acts of a prior owner would be fully entitled in the class action to seek damages including such overcharges under both civil RICO and the New York consumer protection statute. Such overcharges would be fully recoverable because under New York law it is *no* defense to an overcharge claim that the landlord of a rent-regulated property relied upon the rent set or officially registered by a prior landlord. The logic is simple: a successor landlord will ordinarily have complete access to a new building's rent history, and will therefore know, or readily be able to ascertain, whether the rent it is charging is legal.[12] As the New York Court of Appeals explained in *Gaines v. New York State Division of Housing and*

---

[12] *Coulston v. Singer*, 86 Misc.2d 1001, 1003 (AT 1st Dep't 1976)(That a new landlord "failed to include appropriate protective provisions for contingencies incidental to rent controlled premises when he purchased the building is clearly no basis for imposing unintended burdens or limitations upon the statutory rights of the tenant who was a wholly innocent and powerless bystander in the transfer of the property.")

*Community Renewal*, 90 N.Y.2d 545 (1997):

> The rationale for carryover liability was derived from the requirement of section 42(A) of the former Rent Stabilization Code which mandated that landlords keep and preserve sufficient records to determine the legal rent at all times (*see, Matter of Greenthal Co. v. State Div. of Hous. & Community Renewal*, 126 Misc 2d 795, 799). Hence, a successor would always be able to ascertain whether the previous owners had been guilty of overcharges and protect itself accordingly ....

*Id.* at 549.[13]

Following that logic, New York courts routinely impose liability on successor landlords, including treble damages and attorney's fees. *See, e.g., S.E. & K. Corp v. DHCR*, 239 A.D.2d 123 (1st Dep't 1997), *4947 Assoc. v. DHCR*, 199 A.D.2d 179 (1st Dep't 1993). Strikingly, Hamida Moumouni, one of the Objectors on this appeal (and a member of *both* disfavored subgroups) obtained summary judgment in his Housing Court rent overcharge counterclaim against Pinnacle, over Pinnacle's objection that it had not owned the building in March 2003 when the rent for his apartment nearly tripled from $460.72 per month to $1,200. (A855) Pinnacle argued "that it was not the owner of the subject building at the time of the initial lease and therefore it is absolved of all responsibility." The state court held:

---

[13] There is a narrow exception for properties acquired at a foreclosure sale or bankruptcy where no record of the legally regulated rent has been preserved, N.Y. Rent Stabilization Code, 9 N.Y.C.R.R. § 2526.1(f)(2)(i), but there is no indication that this situation applied to any of the buildings in Pinnacle's portfolio.

The argument is not persuasive.  "A new owner alone is under a legal
obligation to obtain the complete rent history and record for all tenants
so as to establish the legal rent by calculating the base rents and
subsequent increases. (citations omitted)  The failure of an owner to
comply with this self-regulating procedure would create liability on the
owner for any rent overcharges.  The reliance by a new owner on the
amount of rent charged by the prior landlord when a simple review of
the rent record shows an overcharge can subject the new owner to
damages for rent overcharges including treble damages." *Turner v.
Spear,* 134 Misc.2d 733, 735 (Civil Ct. NY Cty. 1987); see also, *4947
Assoc. v. DHCR*, 199 A.D.2d 179 (1st Dep't 1993).

*Pinnacle Hamilton LLC v. Moumouni*, NYLJ 6/14/11 (Civ. Ct. N.Y. Co., May 24,

2011). (A868, at 870-871)[14]

The situation with respect to class members whose initial rents were set

before July 2004 is not much different, and the rationale for excluding them from

the benefits of the claims process is equally hard to comprehend. Civil RICO has a

four year statute of limitations, *Agency Holding Corp. v. Malley-Duff & Associates,

Inc.,* 483 U.S. 143 (1987).  Since this lawsuit was filed in July 2007, at a minimum

any class member should therefore be free to assert damage claims in the class

action reaching back to July 2003, not July 2004.  Furthermore, under civil RICO,

the statute of limitations only begins to run from the date when the plaintiff knew,

---

[14] While Mr. Moumouni's counterclaim, interposed as of July 2009 (A869), sought
to challenge an underlying rent set more than 6 years earlier (in March 2003), the
court rejected as well Pinnacle's assertion that the court was barred by operation of
N.Y.C.P.L.R. § 213-a from examining rent records beyond four years, citing
*Grimm v. DHCR*, 5 N.Y.3d 358 (2010) for the principle that where fraud in rent
setting is sufficiently alleged the "four year rule" may be disregarded. (A869-871)

or should have known, of the injury and it is moreover subject to equitable tolling if there has been fraudulent concealment.  *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988) (discovery accrual rule); *Corcoran v. N.Y. Power Auth.,* 202 F.3d 530, 543 (2d Cir. 1999) (equitable tolling).  Since the principal thrust of the complaint here is that defendants engaged in a conspiracy to fraudulently conceal from class members the fact that they were being subjected to illegal rent overcharges, proof of that conspiracy at trial could easily establish the conditions for extending the civil RICO limitations period.

Much the same analysis applies to plaintiffs' claims under the NYCPA.  That statute has a three year statute of limitations, *Gaidon v. Guardian Life Ins. Co. of Am.,* 96 N.Y.2d 201, 208 (2001), so the July 2004 cutoff date for such claims is not completely nonsensical.  But the NYCPA is likewise subject to equitable tolling in precisely the circumstances alleged in detail in the second amended complaint, *viz.,* where the defendant does not merely fail to disclose its wrongdoing but takes continuing active steps to conceal it. *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 788-90 (2012).[15] Again, proof of the complaint's essential allegations would go far to establish the case for equitable tolling for the entire class.

---

[15]  The claim for *active* concealment is pleaded in detail in the Second Amended Complaint.  *See* ¶¶ 8(i), 8(j), 8(k), 51-52, 83-88, 92-95. (A57, 69, 78-79, 80-82)

Significantly, this analysis of the strength of the claims belonging to prior owner claimants and/or pre-2004 claimants was never contested by Class Counsel during the litigation before the District Court over the approval of the settlement. Indeed, in their initial application for preliminary approval of the Settlement, counsel never even mentioned the fact that there *were* two groups of class members that were being totally excluded from participation in the rent overcharge claims process.[16] Even their proposed form of class notice alluded to this only in the most oblique and opaque manner.

At the initial appearance before Magistrate Judge Ellis to discuss Objectors' contentions on October 7, 2011, Class Counsel admitted that *they had no idea* how many class members were excluded under the proposed settlement: "We just never collected that evidence." (A420)  In their definitive memorandum of law in support of settlement approval, Class Counsel acknowledged that prior owner and pre-2004 class members possessed perfectly viable claims, and explained that their claims had been sacrificed, not because they were worthless, but because that is what it took to get the deal:

> ... Class Counsel engaged in contentious negotiations with Defendants over *otherwise viable pre-2004 claims and prior owner claims*, but

---

[16] *See* Memorandum of Law in Support of Motion for Preliminary Approval of Settlement, D.Ct. Docket # 126, filed August 11, 2001.

30

this was eventually a point on which Class Counsel had to yield in exchange for agreement on the comprehensive package of compensation and structural reform contained in the Settlement.[17]

(Emphasis added.)

Thus, to put it simply: no effort was ever made to present any justification for the exclusion of prior-owner claimants and pre-2004 claimants in terms of the relative settlement value of their claims.

The District Court, for its part, neither undertook nor required any independent analysis of the relative settlement value of the claims of these sub-groups as compared to those of the favored 23%, although Objectors had by that time repeatedly drawn *Literary Works* to the court's attention. While the existence of the disfavored subgroups was briefly acknowledged in the court's decision, the court apparently perceived no problem because those groups were free under the settlement to pursue rent overcharge claims under state statutes in state courts. (SPA49-50)  This was no substitute for the required analysis of substantive fairness in allocating the benefits of the settlement to the constituent components of the class.

But even if the proposed settlement had achieved apparent substantive fairness, that would not have been enough to assure adequacy of representation

---

[17]  Memorandum of Law in Support of Motion for Final Approval of Settlement and in Response to Objections to the Settlement Agreement, p. 45, D.Ct. Docket # 181, filed March 16, 2012.

under *Amchem, Ortiz,* and *Literary Works* because the settlement negotiation and
approval process lacked the necessary procedural safeguard: independent
representation of the subgroups with differing claims.  Obviously, in this
connection, it makes no difference whether the settlement value of the disfavored
claims is as high as Objectors claim, or relatively low, as in *Literary Works*, or even
so low as to approach the vanishing point:  One recent district court decision,
relying on *Literary Works*, rejected a proposed settlement in which one subgroup of
claimants would receive nothing, even though the proponents of the settlement said
they had determined through discovery that those claims were wholly without
merit.  That court explained:

> It may be that [the disfavored subgroup's] claims are without merit and
> that the overall settlement is fair in this respect; however, the possible
> fairness of a settlement cannot eclipse the Rule 23 requirements for
> certification.  *Ortiz*, 527 U.S. at 858-59.  The Court must find
> independently that the interests of all class members are adequately
> represented.

*Callender v. Coastal Int'l Sec., Inc.,* 2012 U.S. Dist. LEXIS 32692, *12-13 (W.D.
Ky. 2012).

Courts in this Circuit and elsewhere have not hesitated to void settlements
because disadvantaged sub-groups were not independently represented, even in the
face of evidence of substantive fairness in the allocation of settlement proceeds.  In
*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-*

*Medco Managed Care, L.L.C.,* 504 F.3d 229, 246 (2d Cir. 2007), for instance, this Court rejected a proposed settlement because one sub-group complained that a 55% discount applied to the claims of another sub-group was overly generous. Even though the discount had been arrived at with the assistance both of expert opinion as to the value of the claims and hearings before a special master, this Court agreed that separate counsel representing each sub-group was required. More recently, in *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 187-88 (3rd Cir. 2012), the court rejected the allocation of settlement benefits between two sub-groups because unitary class counsel had selected the dividing line between the advantaged and disadvantaged sub-groups. Even though the claims of the advantaged sub-group plainly had a superior settlement value, and even though the district court had conducted the fairness hearing in an otherwise exemplary manner, the fundamental conflict required separate representation. 681 F.3d at 190.

Here, the District Court failed to take any of the steps required to assure adequacy of representation and compounded the problem by essentially ignoring it, as described below.

C.    The District Court's Unstated but Implied Grounds for Distinguishing *Literary Works* Are Not Persuasive

The District Court did not discuss *Literary Works* by name or in depth, but implicitly found it inapplicable owing to two circumstances: First, although

33

members of the two disfavored sub-groups would not be permitted to assert rent

overcharge claims before the Claims Administrator, they would still retain their

rights to prosecute rent overcharge claims based on state law in state forums.

(SPA40).  Second, the court evinced concern that, if the settlement were rejected,

defendants would move to decertify the class in light of the Supreme Court's

decision in *Wal-Mart*, and all class members, including members in the disfavored

sub-groups, would be worse off as a result.  (SPA5, 23, 30-32, 50).

1.    Some Class Members' Retention of Rights Under State Law
Does Not Justify Their Exclusion from the Rent Overcharge
Relief Afforded to Other Class Members

The retention of state court remedies by members of the disfavored

subgroups does not render inapplicable this Court's holding in *Literary Works*.

When this class action was begun, and when the class was certified, no distinction

existed among the members of the three subgroups: all possessed essentially

identical claims under RICO and under the NYSCPA, as well as potential claims

(not amenable to class action treatment) that they could make individually under the

New York State and City laws imposing rent regulations.[18]  Neither the complaint

nor the class certification order recognized the existence of disparate sub-groups.

---

[18] Those laws – collectively referred to hereinafter as "NY rent regulations" –
include New York City Rent Stabilization Law § 26-516(a) ("NYRSL"), Rent
Stabilization Code, 9 N.Y.C.R.R. §§ 2525.1 and 2526.1 ("NYRSC"), and New
York City's Rent Control Law (NYRCL) and Code 9 N.Y.C.R.R. §§ 2200 et seq.

But the settlement agreement created one favored sub-group that could obtain

substantial rent overcharge relief from defendants on their RICO and NYSCPA

claims, while surrendering the right to prosecute NY rent regulation claims against

defendants in state court or administrative proceedings.  The settlement agreement

also created two disfavored sub-groups that could obtain no rent overcharge relief

whatsoever, would permanently lose their rights to prosecute RICO and NYSCPA

claims against defendants, and would be relegated to the state court and agency

remedies that they had possessed when the suit was filed in 2007. Yet it was the

perceived inadequacies of those state remedies in the context of a large group of

potential claimants that had resulted in the bringing of this class action in the first

place, and the passage of time has certainly not cured those inadequacies.

Looked at another way, the favored sub-group started out in 2007 with RICO

claims, with NYCPA claims, and with potential NY rent regulation claims, and

ended up in 2012 with substantial rent overcharge relief on their RICO and NYCPA

claims.  The disfavored sub-groups began with RICO claims, with NYCPA claims,

and with potential NY rent regulation claims, and ended up in 2012 possessing only

the unadjudicated NY rent regulation claims they began with, having lost their

RICO claims and NYCPA claims along the way.  The inescapable conclusion is

that the favored sub-group has obtained a valuable benefit, while the disfavored

35

sub-groups have not only obtained no benefit of value – they are materially worse off than when they started.

Nor is this all.  In actuality, for many, and perhaps most, of the members of the two disfavored subgroups, the ability to pursue previously viable overcharge claims may now have been severely eroded, and perhaps completely extinguished. The statute of limitations on rent overcharges under New York law is set forth primarily in N.Y.C.P.L.R. § 213-a:

> An action on a residential rent overcharge shall be commenced within four years of the first overcharge alleged and no determination of an overcharge and no award or calculation of an award of the amount of any overcharge may be based upon an overcharge having occurred more than four years before the action is commenced. This section shall preclude examination of the rental history of the housing accommodation prior to the four-year period immediately preceding the commencement of the action.

In essence, then, § 213-a contains *two* four year rules: (a) a "damages" limitation with respect to the number of years for which damages can be collected from the date such claim is made; and (b) a further "evidentiary" limitation with respect to retrospective examinations of rental history.  As to the "evidentiary" four year rule, the state courts have shown an increasing willingness to go beyond under certain circumstances, as in the case of Objector Moumouni, (*supra*, at p 28), where a tenant can make a sufficient showing of fraud, based on the New York Court of Appeals holdings in *Thornton v. Baron*, 5 N.Y.3d 175 (2005) and *Grimm v. New*

36

*York State Division of Housing and Community Renewal*, 15 N.Y.3d 358 (2010).
No state court, however, has extended the "damages" component of the four year
rule; it remains absolute.[19]

Since the class action complaint never asserted damage claims arising
directly under NY rent regulations, this class action may well not have tolled those
claims. If this is so, then "prior owner" claimants and "pre-2004" claimants
excluded by the settlement – even if they filed a state proceeding today – will have
irrevocably lost *all* claims for damages from rent overcharges collected more than
four years ago, *i.e.,* from July 2003 through December 2008.  And even for these
class members' remaining claims for overcharges wrongly collected within the past
four years, to the extent that such claims may require examining rent histories from
beyond four years ago those claims may now face significant difficulties of proof,
since many – perhaps most – of such class members will now have the additional
burden of making out a prima facie fraud claim in order to do so.[20]

---

[19]  The operation of these two four year rules and various tolling provisions is
somewhat complex, and analyzed in more detail in Objectors' various filings in the
District Court.  *See* Objectors' Response to Court's Questions April 20, 2012
(A601-616); Objectors' October 6, 2011, Brief (A830-A835).

[20]  And, of course, the settlement agreement does *not* provide funding for legal
assistance to these disaffected class members to help them develop and prosecute
such claims in state fora.

The District Court recognized the likely total extinction of some prior owner claims and pre-2004 claims, stating:

> The objection is made that Class Members with Excluded Claims will face significant difficulties obtaining relief in the State courts and agencies, due to issues like insolvent prior owners, statute of limitations, and otherwise. But these realities have nothing to do with the approval or non-approval of the Settlement; these obstacles are creatures of New York law and the passage of time, not anything the Settlement does.

(SPA-40). But this conclusion is surely wrong. It is the settlement agreement itself that would deprive the disfavored class members of the potential benefit of affirmative rent overcharge relief through the claims mechanism. It is that agreement that would permanently extinguish their perfectly viable (and safely-tolled) RICO claims and NYCPA claims, and cast them adrift in the decidedly leaky boat of their residual claims under the NY rent regulations.

Even if prior owner claimants and pre-2004 claimants were no worse off under the settlement than when they started out in 2007, no legal precedent suggests that fairness can be achieved by denying the material benefits of class litigation to sub-groups of class members as long as they are not positively harmed, or if they are merely left in the position they would have occupied if the case had never been filed on their behalf. That is to say, the problem in *Literary Works* would not have been solved by giving Category C claimants no relief at all and telling them they were free to bring their own lawsuits. Nor could fairness have been achieved if the

exposure-only claimants in *Amchem* and *Ortiz* had been similarly left to their own

devices. Solutions of this type amount, in effect, to redefining the class to exclude

groups of class members.  Carried to its logical extreme, class counsel could

negotiate a settlement that made damages available to only a single class member, as

long as the remaining class members were free to start all over again on their own.

No case, and no principle of logic, suggests that such representation of class

members could possibly qualify as "adequate."

2.    <u>Concerns that the Class Might Be Subject to De-Certification<br>Do Not Justify Relaxation of the Adequacy of Representation<br>Requirement</u>

The District Court repeatedly evinced concern, both in its decision of June 6,

2012, and earlier, that the Supreme Court's June 2011 decision in *Wal-Mart*

afforded grounds for decertification of the class. (SPA2-3, 5, 23, 30-32, 50; A448,

472, 565).  Decertification, in turn, would result in there being no benefit to any

class members from the litigation or, as the Court stated, "the net gain to tenants

from this class action would be zero."  (SPA-50).  Although Judge McMahon did

not say so explicitly, she implied that even the disfavored sub-groups would be

better off if the settlement were approved than if it were not, since they would at

least benefit from other aspects of the settlement, such as the "best practices" the

settlement bound Pinnacle to observe or the right to bring harassment claims before

the Claims Administrator.

39

However, the District Court's concerns with the risk of decertification were considerably overblown.  Shortly before issuing its decision, the District Court asked the represented parties to file memoranda addressing the impact of *Wal-Mart*. (A565) Class counsel responded only with an argument that the risk of decertification was a factor the Court could legitimately take into account − counsel did not venture to explain how or why *Wal-Mart* actually *posed* a decertification risk, (A573-575) and Pinnacle merely adopted class counsel's response. (A711) Objectors did specifically address the issue, (A593-600) pointing out the following:

- *Wal-Mart* denied certification because the plaintiffs in that case had failed to make a preliminary factual showing that a companywide policy of sex discrimination existed, since its stores were decentralized and individually managed.  The result was that there simply were no common questions of law or fact. *Wal-Mart,* 131 S. Ct. 2541 at 2553-57. In this case, by contrast, the District Court found that plaintiffs had made a convincing, albeit preliminary, showing that defendants were operating a centrally-directed racketeering enterprise in which apartment rents were illegally inflated and tenants improperly evicted in order to convert rent-regulated apartments into highly profitable condominiums and market rate apartments.  *Charrons*, 269 F.R.D. at 225-26 (A209).  This aspect of *Wal-Mart* poses no threat of decertification.

- *Wal-Mart* also indicated that the Supreme Court would not countenance

40

any attempt to replace individualized determinations of proximate cause and damages with a "Trial by Formula" in which the District Court samples a percentage of an unmanageably large number of claims and then applies the result to remaining class members. *Id.,* 131 S. Ct. at 2556-61. But the District Court never contemplated any such "Trial by Formula" in this case, indicating instead that it would either devise a manageable method of conducting individualized factual determinations or, failing that, only adjudicate defendants' liability on a class-wide basis — and would relegate issues of proximate cause and damages to separate proceedings initiated by class members in forums of their choice. *Charrons,* 269 F.R.D. at 243-44 (A247-248). Wal-Mart in no way suggests that it would be improper to proceed in this manner.

- Finally, *Wal-Mart* also held that courts may not certify claims for back pay under Rule 23(b)(2) because such claims are, in effect, damage claims. Therefore, permitting the case to proceed under Rule 23(b)(2) would deprive class members of the "procedural protections attending the (b)(3) class – predominance, superiority, mandatory notice, and the right to opt out ..." 131 S. Ct. at 2558. Even given its most expansive possible reading, this aspect of the Supreme Court's decision would not call into question the District Court's well-settled ability in a case such as this to devise creative solutions to the determination of individual issues of proximate cause and injury for a (b)(3) class by utilizing a magistrate

judge, special master or claims administrator.  So, as Objectors explained to the

District Court, any perceived difficulties on this score are largely illusory. (A595)

But even if the problems of separate proof of damages  were insurmountable,

absolutely nothing in *Wal-Mart* would prevent this case from proceeding as a claim

for class-wide injunctive relief under Rule 23(b)(2) and as a damages class action at

least on issues of liability under Rules 23(b)(3) and 23(c)(4).

The District Court did not address Objectors' analysis in any way or explain

why it felt that *Wal-Mart* had created anything more than a merely theoretical risk

of decertification.  Instead the court, like Class Counsel, contented itself with

stating that the risk of decertification was an important consideration under

*Grinnell*.  (SPA30).  But even if the court had cogently explained why a significant

risk of decertification made the overall settlement fair and adequate, that would

have been largely irrelevant since (as explained above) apparent fairness alone

cannot excuse inadequate representation. As this Court carefully explained in

*Literary Works*,

> Even if we were to conclude that, as a matter of deferential review, the
> Settlement fairly compensates Category C claims, we cannot rely on
> that fact to affirm class certification, because doing so would conflate
> Rule 23(a)(4)'s adequacy of representation analysis with Rule
> 23(e)(2)'s fairness, adequacy, and reasonableness analysis.  "Rule 23
> requires protections under subdivisions (a) and (b) against inequity and
> potential inequity at the precertification stage, quite independently of
> the required determination at post-certification fairness review under
> subdivision (e) that any settlement is fair in an overriding sense."

*Ortiz*, 527 U.S. at 858; *accord, Amchem*, 521 U.S. at 621. The possible fairness of a settlement cannot eclipse the Rule 23(a) and (b) precertification requirements. *Ortiz*, 527 U.S. at 858-59. Thus, the adequacy of representation cannot be determined solely by finding that the settlement meets the aggregate interests of the class or "fairly" compensates the different types of claims at issue. See *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 982 F.2d at 743. In the Rule 23(a)(4) context, we must ask independently whether the interests of all class members were adequately represented.

654 F.3d at 254.[21]

Thus, even if the District Court had been correct that members of the disfavored sub-groups would be better off with this settlement than with nothing – a conclusion Objectors vigorously dispute – the settlement cannot be approved because it fails to pass muster under Rule 23.

II.    THE SETTLEMENT SHOULD NOT HAVE BEEN APPROVED BECAUSE THE DISTRICT COURT DID NOT ADEQUATELY ANALYZE THE FACTORS IT WAS REQUIRED TO CONSIDER UNDER *GRINNELL*

In evaluating the fairness of a proposed settlement, the District Court must consider the nine factors set out in *Grinnell, supra,* 495 F.2d 448 at 463. Those factors are:

---

[21]  In the cited passage in *Amchem*, the Supreme Court made it clear that, while some Rule 23 concerns, such as manageability, may be muted in the settlement context, others "demand undiluted, even heightened, attention ..." 521 U.S. at 620. The Court continued, "Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed." *Id*. at 621.

1.    The complexity, expense, and likely duration of the litigation;

2.    The reaction of the class to the settlement;

3.    The stage of the proceedings and the amount of discovery completed;

4.    The risks of establishing liability;

5.    The risks of establishing damages;

6.    The risks of maintaining the class action through the trial;

7.    The ability of the defendants to withstand a greater judgment;

8.    The range of reasonableness of the settlement fund in light of the best possible recovery; and

9.    The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Objectors' major concern with the District Court's analysis of these factors is its superficiality. This is most apparent in the court's discussion of the various types of litigation risk, *i.e.,* the risk of establishing liability (Factor 4), the risk of establishing damages (Factor 5), and the risk of maintaining the class action through the trial (Factor 6). The court placed heavy reliance on these factors. (SPA29-32). Yet these risks are present in virtually every case; thus, their mere presence does not help distinguish good settlements from bad. In order to do so, a district court must scrutinize the record carefully to determine whether the particular risk at issue is great, middling, or small.

The District Court undertook no such analysis here. As noted above, the

44

court never explained why *in this case* the Supreme Court's decision in *Wal-Mart* posed a significant risk of decertification, *i.e.,* a risk of maintaining the case as a class action through trial, (Factor 6). Instead, the court merely posited that the risk was large, and then placed heavy reliance on it. (SPA32). Objectors, for their part, explained in detail why they regarded the *Wal-Mart* risk as inconsequential (A593-600), and their analysis was questioned neither by class counsel nor by the court. To be sure, the District Court might possess a superior crystal ball, but it was that court's task to examine (not just assume) the magnitude of any such risk in its decision.

Much the same may be said for the District Court's analyses of the risks of establishing liability (Factor 4) and damages (Factor 5). As to liability, the decision says little more than "Plaintiffs [believe] they have a strong case ... Defendants deny any wrongdoing whatsoever [and] the outcome of [trial] is uncertain." (SPA29). There is no weighing of the strengths of the parties' respective positions.[22] As to damages, the decision is essentially silent, nowhere explaining

---

[22]  By contrast, in its decision certifying the class, the District Court explicitly weighed the strength of the evidence, noting, for instance: "Plaintiffs have presented evidence suggesting that Defendants' alleged fraud and harassment are widespread – for example, between 2004 and 2006, Pinnacle commenced eviction actions against at least 5,000 of its roughly 20,000 tenants; further, an external audit prompted by an OAG investigation found that, between 2002 and 2006, Pinnacle's rent overcharges based on fraudulent 'improvements' totaled almost $ 1 million ..." *Charrons*, 269 F.R.D. at 236 (A232-233).

why tenants should experience any difficulty establishing the amount of their rent overcharge claims given the existence and public availability of records maintained by New York State rent regulation authorities. Again, there might be difficulties that were not apparent to Objectors, but the District Court's decision simply does not address the subject.

Since there was little meaningful discussion of these litigation risks, it follows that the District Court's assessment of the adequacy of the recovery in light of those risks (Factor 9) was also insufficient.  Factor 9 requires comparison, and the magnitude of one of the two things being compared is unknown. As to Factor 8, which the District Court lumped in with its discussion of Factor 9 (SPA33-35), it is true that both what *eligible* class members might receive and what they must give up are more-or-less known quantities, making comparison possible.  But the court's decision does not compare them in a meaningful way.  After all, the biggest thing Class Counsel surrendered in order to get the deal they got was the rent overcharge claims of all the class representatives and at least 77% of all class members. The critical issue in this appeal is whether that bargain was a justifiable one.  On this, the District Court's decision is silent.

Of the remaining *Grinnell* factors, the most important is Factor 3, the stage of the proceedings and the amount of discovery completed.  Here, the most critical fact, all but unacknowledged by the District Court, is that class counsel engaged in

46

exactly no merits discovery.  That failure infected the analysis of virtually every

other *Grinnell* factor.  Because class counsel undertook no merits discovery, they

were unable properly to apprise the court of the strengths and weaknesses of the

liability claims (Factor 4), and the court was unable properly to assess those

strengths and weaknesses.  The same is true for the strengths and weaknesses of the

damages case (Factor 5).

Likewise, an evaluation of the complexity, expense and likely duration of the

litigation (Factor 1) depends on evidence of liability and damages obtained by Class

Counsel through discovery; the task of proving the case at trial could be

exceptionally difficult, exceptionally easy, or anywhere in between.  Without

discovery, all is guesswork.  At the time the settlement was originally proposed, it

should be remembered, Class Counsel did not even know whether they had traded

away the rent overcharge claims of 10% or 90% of the class.[23]

Class Counsel argued below that merits discovery was unnecessary because

defendants had "assumed" liability for settlement purposes and that damages

discovery was not needed because Defendants had agreed to "unlimited" liability in

---

[23]  More alarmingly, Class Counsel were apparently unaware that the settlement,
as originally proposed, fully extinguished even the state law rent overcharge
claims of the prior owner and pre-2004 claimants.  *See* pp. 13-14 *supra*. This
oversight was not corrected until after Objectors brought it to the court's
attention in October 2011.  *See* pp. 16-18 *supra*.

claims brought before the Claims Administrator.[24]  Both arguments are absurd.  As

to merits discovery, *Grinnell* requires that the proponent of the settlement

demonstrate that it obtained enough information through discovery to enable it and

the court to *intelligently* weigh the risks and rewards of further litigation.

Settlement does not excuse this requirement; it is why it exists. As for the amount

of damages Pinnacle would be required to pay, Defendants' assumption of

"unlimited" liability applied only to the claims of a favored sub-group of the

plaintiff class whose size, at the time of settlement, was completely unknown (to

Class Counsel, if not to Pinnacle).  It may frankly be questioned whether Class

Counsel would have agreed to the settlement had they understood, at the time, how

few of their clients stood to gain by it and how small the overall recovery might

turn out to be.  There can be no serious argument that some discovery on damages

issues would have greatly benefitted the entire settlement process.

The final *Grinnell* factor is Factor 2, the reaction of the class to the

settlement.[25]  Out of 26,000 tenants allegedly receiving notice, about 1% objected

or opted out of the class.  (SPA26).  The court weighed this factor in favor of final

---

[24]  *See* Memorandum of Law in Support of Motion for Final Approval of
Settlement and in Response to Objections to the Settlement Agreement, p. 29,
D.Ct. Docket # 181, filed March 16, 2012.

[25]  We have not mentioned Factor 7, the ability of Defendants to withstand a
greater judgment.  Neither the District Court nor class counsel appeared to regard
this factor as weighing for or against the settlement.  (SPA32).

48

approval.  (SPA25-27).

Yet the importance of this factor should not be exaggerated. As this Court held in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 16 (2d Cir. 1981), the lack of objection by the great majority of claimants means little where the notice explaining the settlement to class members does not adequately apprise them of the settlement terms.  The particular flaw in the *National Super Spuds* notice was that it failed to specifically alert one category of claimant  –  holders of unliquidated potato futures contracts – that these claims "were being placed on the block although these class members were to receive nothing in return."  660 F.2d at 16.  Class members could access that information only by reading the stipulation of settlement, which the notice advised them to do. *Id.* at 14.

The parallels between *National Super Spuds* and this case are notable:  The notice sent to class members on September 2, 2011, alerted them to their possible exclusion from participation in the rent overcharge claims process only in the following manner:

> Pinnacle is not responsible for rent overcharges through this lawsuit in two cases: (1) if rent was set before beginning of class period (July 11, 2004) or (2) if rent was set by a prior owner. (A296)[26]

---

[26]  The revised notice in January 2012 utilized nearly identical language (A704). Objectors asked the court to require a fuller explanation (A547-561), but this was denied. (A490-493)

49

How would a member of the class, who suspected that her rent might be unlawfully high, know that this provision excluded her?  To begin with, she would have to have read the notice as if it referred to rents not "set" but "initially set" before the beginning of the class period or by a prior owner.  Otherwise, any claimant who knew that her rent had been "set" last December at the time of her most recent lease renewal might simply assume that this exclusion from recovery did not apply to her. In addition, in order to know whether to object or opt out, a pre-2004 claimant would have had to have information that the unlawful act that required her to pay an illegal rent had been committed before July 11, 2004.  In the case of a prior owner claimant, she would have needed information that the unlawful act had been committed by an owner prior to Pinnacle.

It is surely obvious that few class members – people living in New York City's poorer neighborhoods, many with little formal education, many completely non-English-speaking – would possess this information or even know how to get it.  It could not be obtained from class counsel who, by their own admission, had no idea which, or even approximately how many, class members belonged to the disfavored sub-groups.  Underlying rent data *could* be obtained from public agencies with the assistance of the free legal counsel afforded to class members by the settlement, but that assistance would not be available until after the settlement

had been finally approved.  As a practical matter, class members would have to

know how to request and obtain the correct records from the correct New York

State agency – and correctly interpret them – all in the approximately 52 day

window between receipt of notice and the March 2, 2012, deadline for objections

and opt-outs.[27]  This is a much more complicated task than that faced by the

relatively more sophisticated class members in *National Super Spuds*, who only

needed to request a readily available stipulation of settlement.

　　　　Thus, the Court can safely assume that many more class members would

have objected or opted out had they really understood the settlement's terms.  After

all, the settlement as initially put forth not only denied rent overcharge relief to

members of the disfavored sub-groups but actually stripped from them their rights

under RICO, under the NYCPA, *and* under New York's own rent regulation laws.

What sane and properly informed class member belonging to one of these groups

would not have opted out under these circumstances?  But very few did. Surely the

silence of the overwhelming majority reflects inadequate information, not informed

consent.

　　　　In summary, the District Court's analysis of the *Grinnell* factors was

---

[27]  Indeed, Objectors had urged that the revised Notice at a minimum let tenants
know that they could request these records from the relevant State agency (A549,
560), a suggestion that was rejected.

insufficiently thorough.  Although the court is obviously not required to try the case on the merits in order to determine whether a proposed settlement is fair, it must perform a reasonably detailed assessment of the strengths and weaknesses of the plaintiff's factual and legal case and discuss the possible and likely outcomes, including the possible range of recovery of damages.  "Although we do not expect district judges to convert settlement hearings into trials on the merits, we do expect them to explore the facts sufficiently to make intelligent determinations concerning adequacy and fairness."  *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982).

An illustrative case is *Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982), where the Court upheld the settlement of two securities class actions despite concern that the district court's discussion of the substantive merits had been cursory.  This Court noted that the district court had before it lengthy affidavits from both parties which "carefully described the history of the litigation and, more important, thoroughly canvassed the evidence, both that supporting and that refuting plaintiffs' claims."  698 F.2d at 74.  The plaintiffs' pre-settlement preparation and discovery efforts were "substantially more thorough" than usual; the district court also had available to it "extremely relevant" discovery materials from a bankruptcy trustee's investigation; and the district court had the "unusual and important benefit of several careful and well-reasoned opinions" by a

Bankruptcy Judge which "provided excellent guidance from a disinterested source on questions central to the fairness and adequacy of the proposed settlement." *Id.* Together, these materials enabled the court to "'apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Id.,* citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968). *See also Grinnell*, 495 F.2d at 462-64; *Malchman v. Davis*, 706 F.2d 426, 433-35 (2d Cir. 1982).

If *Weinberger* illustrates an adequate district court assessment, this case illustrates the opposite. The District Court never discussed or analyzed the risk of establishing liability. The court never analyzed the risks of decertification. The court never even mentioned the risk of establishing damages. This is not enough. The Supreme Court might have been speaking of this case when it said

> It is essential, however, that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law. Here there is no explanation of how the strengths and weaknesses of the debtor's causes of action were evaluated or upon what grounds it was concluded that a settlement which allowed the creditor's claims in major part was "fair and equitable." Although we are told that the alternative to settlement was "extensive litigation at heavy expense" and "unnecessary delay," there is no evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation. Litigation and delay are always the alternative to settlement,

and whether that alternative is worth pursuing necessarily depends
upon a reasoned judgment as to the probable outcome of litigation.

*Protective Committee for Independent Stockholders of TMT Trailer Ferry,* 390 U.S.

414 at 435-36.  Although that case involved approval of a bankruptcy

reorganization plan, not a class action settlement, it has been repeatedly cited by

this Court as setting the correct standard for fairness determinations under Rule 23.

*See Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1080 (2d Cir.

1995); *Malchman*, 761 F.2d at 900; *Plummer*, 668 F.2d at 659; *Weinberger*, 698

F.2d at 73-74; *Grinnell*, 495 F.2d at 455.

CONCLUSION

For the reasons stated above, the judgment appealed from should be reversed

and the case remanded for further proceedings before the District Court.

Dated: New York, New York
December 21, 2012

   /s/ James M. Baker
NORTHERN MANHATTAN
IMPROVEMENT CORP. LEGAL SERVICES
    Kenneth Rosenfeld
    James M. Baker
    Matthew J. Chachère
    76 Wadsworth Ave
    New York, New York 10033
    212-822-8300

URBAN JUSTICE CENTER
    Harvey David Epstein
    David A. Colodny
    123 William St
    New York, New York10038
    646-602-5600

YANKWITT & McGUIRE
    Harold F. McGuire, Jr.
    140 Grand Street
    White Plains, NY 10601
    914-686-1500
    *Attorneys for Objectors-Appellants*

## Certificate of Compliance

This brief complies with the type-volume limitation of FRAP 32(a)(7)(B). This brief contains 13,112 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Word 2007 in Times New Roman 14-point font.

Dated: December 21, 2012

/s/ James M. Baker
*Attorney for Objectors-Appellants*